ORIGINAL
U.S. BANKRUPTCY COURT
DISTRICT OF HAWAII



IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| In re | ) | Case No. 99-00443 |
| | ) | (Chapter 11) |
| RIVERHEAD LAND DEVELOPMENT | ) | |
| INC., | ) | |
| | ) | March 10, 1999 |
| Debtor. | ) | |

TRANSCRIPT OF MOTION FOR EXCUSE FROM TURNOVER
PURSUANT TO 11 U.S.C. § 543(d(2) AND
MOTION TO ANNUL AUTOMATIC STAY OR, IN THE
ALTERNATIVE, FOR RELIEF FROM AUTOMATIC STAY
BEFORE THE HONORABLE LLOYD KING
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Bank of Hawaii

MICHEAL C. WEBB, ESQ.
20th Floor, Hawaii Building
745 Fort Street
Honolulu, HI  96813


For Custodian
  James Del Rio

ROBERT E. CHAPMAN, ESQ.
Amfac Tower, Suite 2100
700 Bishop Street
Honolulu, HI  96813


For Robert A. Ewert

ROBERT J. FARIS, ESQ.
Suite 1400, Hawaii Building
745 Fort Street
Honolulu, HI  96813


For Riverhead Land
  Development Inc.

JERROLD K. GUBEN, ESQ.
Grosvenor Center, Makai Tower
733 Bishop Street, Suite 2400
Honolulu, HI  96813


Transcriber:

JUVELYNN FAGARAGAN
1164 Bishop Street, #124-200
Honolulu, HI  96813


Audio Operator:

NEAL MAESHIRO

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1                     --oOo--

2       THE CLERK: (Calls case.)

3       MR. WEBB: Good afternoon, Your Honor. Micheal

4 Webb on behalf of creditor Bank of Hawaii.

5       MR. CHAPMAN: Good afternoon, Your Honor. Robert

6 Chapman appearing for Commissioner James Del Rio.

7       MR. FARIS: Your Honor, Robert Faris for the

8 successful foreclosure bidder, Robert Ewert.

9       MR. GUBEN: Good afternoon, Your Honor. Jerrold

10 Guben on behalf of the Debtor and Respondent, Riverhead Land

11 Development Company.

12       THE COURT: Good afternoon.

13       We have two motions here. One, to excuse the

14 turnover by the receiver and also we have a preliminary

15 hearing on a motion for relief from stay.

16       The receiver, of course, is proceeding under the

17 wrong subdivision. The receiver is a custodian, not an

18 assignee for the benefit of the creditors and a custo -- the

19 receiver can be excused from turning over if the --

20 permitting the custodian the continuing possession is in the

21 interest of creditors.

22       The -- the thing I'm -- one thing I'm interested

23 in is what's going on here. The -- is -- is there some

24 outside agreement between the purchaser and the bank? The

25 sale is going through for $50,000 free and clear and that

1     seems kind of surprising.  Is this an end runway to get a

2     deficiency judgment against the Debtor or what -- what's

3     going on?

4           MR. WEBB:  Well, Your Honor, the -- there's

5     nothing going on more than a commercial foreclosure in the

6     First Circuit Court.  The value of the property at public

7     auction was zero.  There was no bid.  The value of the

8     leasehold estate at the confirmation was 50,000.  We were --

9           THE COURT:  Bank of Hawaii will --

10          MR. WEBB:  We were pleased to have some --

11          THE COURT:  Bank of Hawaii will have no further

12    interest in the property of any kind if Mr. Ewert acquires

13    the property?

14          MR. WEBB:  That is correct.  The only thing that

15    will be left is the deficiency judgment against the Debtor

16    and the two personal guarantors.  But there is no -- there

17    is no deal between the bank of Mr. Ewert.

18          THE COURT:  All right.  Well, that -- that was

19    what I --

20          MR. WEBB:  In fact, we had never met Mr. Ewert.

21          THE COURT:  I just wanted to be sure of that.

22          MR. WEBB:  No, we had never met the man.  We were

23    pleased to see that he was at the confirmation hearing, but

24    we had no prior relationship and have no relationship with

25    him now that I'm aware of.

1      THE COURT:  Why would the bank allow this to

2  happen?  I mean, is -- is it -- is it commercially

3  reasonable from the bank's standpoint?

4      MR. WEBB:  Yes, Your Honor, it is.  We've been in

5  this foreclosure now for two years and there has been a

6  couple of attempts to work this out, but those attempts have

7  failed.  The fact is, in the public market, this leasehold

8  estate has very little, if any, value and it has been

9  heavily advertised, it's been heavily shown by the

10  commissioner.  Frankly, the bank thinks the commissioner did

11  a fine job in presenting the property to the -- to the

12  market and the bank is interested in getting this resolved.

13  There are other properties that the personal guarantors have

14  that can satisfy this debt, and from all appearances, that's

15  where the bank's going to have to go.

16      THE COURT:  Mr. Guben has suggested that the

17  receiver projects $111,000 in excess of debt service and

18  income for -- for 1999.  Is that crazy or --

19      MR. WEBB:  I think it is, Your Honor.  Mr. Guben

20  has told me that there's only enough --

21      THE COURT:  Maybe I miscal -- I don't mean to say

22  Mr. Guben.  I may have misstated what's in his memorandum.

23      MR. WEBB:  Your -- Your Honor, I think if you look

24  at Exhibit A to the supplemental memorandum that was

25  submitted by the bank, you'll see a letter from Mr. Guben

1  where he tells me that the property will not be able to
2  generate any more than $9,000 above its other costs and
3  expenses to pay the bank if there's a workout.  I don't see
4  that there's, you know, what is that, nine times twelve,
5  whatever that comes out to be, 111,000, but that is not
6  enough to retire this debt within the -- within the period
7  it has to be retired.
8         THE COURT:  Well, is -- is -- is Mr. Ewert getting
9  an extraordinary deal then if he gets the property for
10 $50,000 with no mortgage and it generates $108,000 annually
11 in rent?
12        MR. WEBB:  Actually, Your Honor, we don't think
13 so.  There are several leases up for renegotiation within
14 the next few years.  This lease itself is up for
15 renegotiation I believe in just a matter of a year, two
16 years.  I -- I would assume that those negotiations are
17 going to lead to a higher ground lease rent.  There are a
18 number of uncertainties here that Mr. and Mrs. Yasso or
19 whoever is going to purchase this property have to deal with
20 and I -- you know, nobody else was interested in the
21 property, nobody else thought it had any value.  Mr. Ewert
22 coming in paying $50,000.  I assumed he evaluated the
23 property and figured that's what it was worth.  Nobody else
24 thought so.  The bank did not.
25        Your Honor, to us, the -- the basic question here

1    is, first of all, whether this is part of the estate.  We

2    don't believe it is.  We've briefed those -- those reasons

3    extensively.

4             THE COURT:  All right.  Well, I'll tell you.  I'm

5    -- the way I proceed is that it is property of the estate

6    until an order is actually entered.  I -- I realize you got

7    about as close as you can in this case, but there was no

8    order had actually been entered.  I've read the -- what I

9    believe is the proposed order, but --

10            MR. WEBB:  Well, there was -- there was a --

11            THE COURT:  -- in any event, so I'm going on the

12   assumption that it is the property of the estate, that the

13   receiver is a custodian, that if it's in the best of

14   creditors as well it might be in this case that I can excuse

15   a turnover by the custodian.  But I'm just trying to make

16   sure the -- all the facts are before me at -- at this time.

17            MR. WEBB:  Just -- just to make sure that I

18   understand.  What the Court would be looking for then was

19   the written confirmation order to be entered at which point

20   it would not be property of the estate, but any point prior

21   to that it is the property of the estate?

22            THE COURT:  Yes.  You know, we have to have a

23   cutout point and -- for continuity so that people know here

24   that's -- that's the way we've been doing it, yes.

25            MR. WEBB:  All right.  Your Honor, that still

leaves the issue of adequate protection for the bank and there clearly is not adequate protection for the bank in this. There's a $1.6 million debt pending to the bank. Even by Mr. Hastings' recent appraisal, there's only $1.2 million in this property.

THE COURT: Yeah, but if the -- if the bank will -- will abandon its position for $50,000 and rely on the proceeding against the individuals, then there isn't much to be had in the way of adequate protection. And with the income stream, it would seem that if the property is worth $50,000 today for $108,000 in income over the year, it's probably worth that in the -- in the future.

What does the receiver have by the way in -- it talk -- there's a talk about paying the receiver's expenses and so forth out of accumulated funds. What sort of funds does the receiver have on hand?

MR. WEBB: I think the receiver is currently holding about $40,000, but that $40,000, Your Honor, is going to go primarily to pay his fees and to pay his attorney's fees. There'll be a small amount left over after all of those fees are paid.

THE COURT: Okay. Well, my question --

MR. WEBB: Very little beyond that.

THE COURT: My question is for Mr. Guben is going to be, maybe somebody else is going to get a good deal on

1   this property, but I'm not sure if the Debtors can come out

2   -- can get too much a benefit out of it. So there still may

3   be a reason, but I would like to hear from Mr. Guben.

4         MR. GUBEN: Yes, Your Honor. I think the Court

5   has ruled correctly.

6         THE COURT: And I'll give other counsel an

7   opportunity to be heard, too, but I'd like to get this

8   information.

9         MR. GUBEN: Two things. The Court was correct. I

10  was simply using as Exhibit A the commissioner's report of

11  December 10th, 1998 to establish at page 3 of that report

12  that the commissioner, in his projected 1999 budget, shows a

13  net income of $111,315. So the Court is correct on the

14  exact number.

15        Also, with respect to the executive summary, page

16  1 of our Exhibit A does set forth up until the year 2000,

17  August 2000, the rent is $60,000 a year. It stepped up in

18  the next five-year period, 2000 -- August 2000 to August

19  2005 to $84,000, then is stepped up as per the lease for the

20  remaining period of time including the --

21        THE COURT: Is that the ground lease or what --

22        MR. GUBEN: Ground lease. It's a ground lease.

23  So, in fact, it would be possible, Your Honor, for somebody

24  who is going to calculate as Mr. Hastings did with respect

25  to the present cash flow value of the property. Not a

1   comparable, but cash flow value what in fact this property

2   is worth.

3        THE COURT: How much in fact is the ground rent

4   now?

5        MR. GUBEN: Now it's $60,000 a year or $5,000 a

6   month until the year -- excuse me, until August 2000. It

7   then is bumped up to $7,000 a month.

8        THE COURT: All right. So that's a fact that I

9   was ignoring in my previous analysis that there was ground

10   rent to -- to be paid.

11        MR. GUBEN: The ground rent has fully been paid

12   and is, as I understand it, is current.

13        With respect to the issue of adequate protection,

14   Your Honor, I think the Court is correct. You are

15   adequately protected up to the value of your property simply

16   because you are undersecured. Undersecured does not mean

17   that you're entitled to adequate protection.

18        Under the Timbers case, you're entitled to

19   adequate protection to the deterioration or decline in value

20   of the property during the period that the automatic stay is

21   in place as long as, as we've seen, rents will be

22   continuously coming in with respect to if there is cash

23   collateral. That cash collateral is protected by a

24   replacement lien. There is no indication that Chaney

25   Brooks, which is the leasing agent, is not doing a diligent

1    job or cannot rent that property at 505 Ward Avenue.

2            So with respect to adequate protection, Your

3    Honor, I think that the replacement lien in the ongoing

4    rents certainly satisfies that.

5            With respect to the $1.2 million as the Court

6    indicated, they were willing to abandon it for virtually

7    their attorney's fees and look to the personal guarantors.

8    And that's how the plan is going to be financed.

9            The personal guarantors, individuals, do have

10   additional property.  That will be sold to pay them the 505

11   Ward Avenue mortgage and to pay off -- this is the -- the

12   kicker, that the Bank of Hawaii has the first mortgage on

13   the guarantors' Kailua property.  So, in fact, there's

14   almost cross-collateralization if not in de jure, it's

15   certainly de facto.  So there is oversecurity with respect

16   to any of the -- the loans here.  I think that Mr. Webb

17   should have brought that out that in fact the Bank of Hawaii

18   does know the value of the Kailua property, what in excess

19   of the $470,000 that they now hold over the first mortgage.

20           So we think, Your Honor, that combining the

21   properties of the personal guarantors, Mr. Yasso who is the

22   responsible person, along with 505, that it is possible to

23   reorganize, pay the Bank of Hawaii both on the Kailua note

24   as well as the Ward Avenue note and have a successful

25   reorganization.

1      THE COURT:  If the matter is set for a final

2  hearing, would you be able to file a proposed plan and

3  disclosure statement in advance of the final hearing?

4      MR. GUBEN:  Yes, Your Honor, we can file that very

5  quickly, although it's certainly short of the exclusivity

6  period.  I would have to crunch some numbers, but I think it

7  is possible, although the question about feasibility it does

8  depend on the sale of two parcels of the three parcels in

9  Kailua, but that's if the Court wouldn't mind the

10 feasibility of the sale of the two parcels in Kailua as part

11 of our plan that that's what we in fact propose to do.

12     THE COURT:  Well, it -- it seems to me that if

13 this leasehold estate is only worth $50,000, we aren't

14 playing with much and that the main thing is probably what's

15 going to happen to the people who will be stuck with the

16 deficiency judgments and their assets.  Whether they stay

17 out of bankruptcy or not I suppose remains to be seen.

18     But subject to hearing from counsel, my tentative

19 view is that we should put this matter over for a final

20 hearing to -- on the motion for relief from stay.  In the

21 interim, grant the motion to excuse turnover.

22     MR. GUBEN:  We have no problem with that, Your

23 Honor, and -- although we'd like to have that also a

24 provisional interim order, but we have no problem with Mr.

25 Del Rio's statement charge.

1     THE COURT:  At -- at least pending a ruling on the
2  motion for relief from stay to give you, Mr. Guben, an
3  opportunity to see if you can propose a plan.  It might even
4  be something that would be of interest to the bank or
5  somebody else.  I don't know.
6     MR. GUBEN:  Certainly, Your Honor.
7     THE COURT:  All right.  So, but that's subject to
8  hearing from counsel.
9     MR. CHAPMAN:  Good afternoon, Your Honor.  I'm
10 Robert Chapman representing the commissioner.
11    THE COURT:  Yes, Mr. Chapman?
12    MR. CHAPMAN:  Mr. Del Rio was appointed by the
13 First Circuit Court in March 1997 and attached to his
14 affidavit is the Findings of Fact which was actually
15 recorded in the Bureau of Conveyances of the State of Hawaii
16 in August of 1997.
17    By that order, the commissioner took legal and
18 equitable title.  Paragraph 5 specifically directs that the
19 commissioner holds legal title and equitable title.  And in
20 paragraph 9 of that order, the court indicates that the
21 defendants are perpetually barred of and from any and all
22 rights, title and interest to the mortgage property.
23    Hawaii has been a title state for many years.
24 That is that the commissioner, upon being appointed, holds
25 title and the Findings of Fact are recorded in the land

1   records. So at that point in time, Your Honor, it's our

2   understanding that the defendant in the foreclosure

3   proceeding no longer has any interest at all and the

4   foreclosure commissioner holds the interest.

5           THE COURT: You mean, (unintelligible) to the

6   foreclosure decree, the -- the Debtor can't come in and

7   satisfy the obligation and keep the property?

8           MR. CHAPMAN: With agreement of the lender, they

9   may be able to do that by the lender dismissing the

10  complaint, but technically, I believe the law in the State

11  of Hawaii is that the commissioner holds legal ownership,

12  both equitable and legal title, and that appointment of

13  commissioner is a final and appealable order by the Circuit

14  Court.

15          As cited in our memorandum, Your Honor, the 54(b)

16  certification is given by the First Circuit Court to the

17  order appointing commissioner and that is the appealable

18  event for purposes of title. Once the commissioner has

19  ownership, there is no longer any interest from the Debtor.

20          Riverhead argues that this a case of first

21  impression. Actually, we believe that it is not, that there

22  is clear and direct precedent in the In re Kealia Beach

23  case, 199 -- a 1982 decision in this Court where Judge

24  Chinen clearly recognized that the debtor has no right of

25  redemption in Hawaii, that once the commissioner is

1   appointed, their only interest is like anyone else in the
2   general public and that is to come in at the confirmation or
3   at the public auction and bid for the property and in that
4   way influence how much or whether or not there will be a
5   deficiency, but the debtor has no interest in the property
6   once the commissioner is appointed.  And the law is the same
7   today as it was in 1982, Your Honor.

8           THE COURT:  Well, I don't have to make a final
9   ruling on that.  I can still set the matter over for a final
10  hearing.  This is just a preliminary hearing.

11          MR. CHAPMAN:  Yes, Your Honor, and -- and I'm
12  making my argument for the record.

13          Basically, I think it's clear in the State of
14  Hawaii that the commissioner holds one hundred percent title
15  and that is a final order.  In this particular case,
16  interestingly enough, that order became final in 1997 and
17  was recorded in August of 1997.  So the time for filing any
18  motion or petition to stay the commissioner's title would
19  have occurred in 1997.

20          Riverhead Land further argues that an order in the
21  First Circuit Court is not really final until there is a
22  written order signed and filed in the record and they cite
23  the Brent v. Staveris Development case, 1987.  In that case,
24  the court ruled that a successful bidder at a public auction
25  was not vested in any interest in land until the sale have

1  been confirmed by the court and that case was referring to
2  the -- the buyer of the property.

3  In this case, the sale has been confirmed by the
4  First Circuit Court.  Judge Chang made a ruling and his
5  minute order reflects that ruling and he also certified it
6  as a 54(b) ruling under the Hawaii Rules of Civil Procedure.

7  There has been no filed written order, but it is
8  reflected in the court minutes as a final order.  And even
9  if that order can be construed not final, the title would
10  not be in the Debtor in this case.  It would be in the
11  commissioner.

12  This <u>Staveris Development</u> case was referring to
13  who has title at a confirmation hearing and it would really
14  be a choice between the commissioner still having title or
15  the buyer having title or -- or an interest in the property.
16  But in any event, you could not use those cases to support
17  the position that the original borrower still had title.

18  We also join in the argument the Bank of Hawaii
19  had made that -- that there is no adequate protection for
20  them.  There's a mortgage balance of approximately 1.6
21  million and a debt --

22  THE COURT:  But that has nothing -- no relation to
23  this property, that number, it would seem.

24  MR. CHAPMAN:  It seems, Your Honor, that there are
25  a lot of factors gone into this property.  As indicated by

1 Commissioner Del Rio's affidavit, he went through the normal

2 steps and, in fact, took some extraordinary steps to try and

3 generate interest.  A lot of commercial brokers received

4 information about the property.

5        THE COURT:  Which -- which seems to support the

6 notion that there's no value in the property beyond the

7 $50,000 and -- and that the --

8        MR. CHAPMAN:  It has minimal value.

9        THE COURT:  -- Bank of Hawaii is grossly

10 undersecured.

11        MR. CHAPMAN:  It has minimal value for a number of

12 reasons.  I may be aware of some of those reasons, although

13 they're not presented in the affidavit or arguments here,

14 Your Honor, but there are a lot of factors that affect this

15 property.  The declining value of the property over time is

16 directly related to the increasing ground lease rents over

17 time.  There's also a number of points in the future where

18 lease renewals for existing tenants will come up, and if the

19 tenants choose not to renew, the property may be difficult

20 to rent and actually create a loss.  There are other --

21        THE COURT:  Aside from debt service, what are the

22 receiver's income and expenses per month right now?

23        MR. CHAPMAN:  The property --

24        THE COURT:  Before debt service.

25        MR. CHAPMAN:  I'm not sure I have the

1   commissioner's report with me, but it's my recollection that

2   after paying the operations of the building, the real

3   property taxes, management fees and expenses and insurance,

4   there is approximately the $8,000 per month and that also

5   includes after paying the current ground lease rent.

6           THE COURT:  Eight thousand a month?

7           MR. CHAPMAN:  It's my understanding, Your Honor.

8   And that would be then available to pay the first mortgage,

9   Bank of Hawaii, with the mortgage payment each month is

10  somewhere in the neighborhood of $14,000 a month.  So

11  there's a --

12          THE COURT:  A gap.

13          MR. CHAPMAN:  The longer the debtor-in-possession

14  holds the property, the greater the deficiency becomes

15  because it's actually unable to even pay the interest to the

16  loan, the amortization of principal and interest.

17          So basically, Your Honor, we're pointing out that

18  under State of Hawaii law, Riverhead Land had no further

19  interest in the property as of March 1997.  Its schedules

20  are incorrect.  Its argument is incorrect under Rule -- Code

21  541.  There is no interest in the property and, therefore,

22  the Section 362 stay does not apply.

23          An alternative, the Bank of Hawaii does not have

24  adequate protection and the Debtor has no equity in the

25  property and, therefore, the stay should be lifted so that

1    the First Circuit Court can complete the confirmation which

2    is all but done.  The written order simply needs to be

3    entered and, therefore, the commissioner can complete his

4    task which is what he was assigned to do in 1997.

5            Commissioner Del Rio has done a good job, has

6    worked hard to try and develop interest in the property.

7            THE COURT:  I'm not in any way criticizing the

8    receiver or anybody else.

9            MR. CHAPMAN:  There was some indication that

10   somehow the receiver should have been able to obtain a much

11   higher price, but I simply think that the reality of the

12   market --

13           THE COURT:  That was -- that didn't come from me.

14           MR. CHAPMAN:  I understand.  The reality of the

15   market is that it was not possible.  The commissioner should

16   be allowed to complete his job, be paid for his work in the

17   First Circuit Court and simply -- whether this Chapter 11

18   procedure (unintelligible), the 505 Ward Avenue property was

19   -- is not part of the estate, legal title and equitable

20   title was -- was removed almost two years ago.

21           Thank you, Your Honor.

22           THE COURT:  You're welcome, Mr. Chapman.

23           Mr. Faris?

24           Before you go ahead, Mr. Faris, Mr. Clerk, what do

25   we have for a final hearing date just so we can have that in

1    my --

2            THE CLERK:  The next date would be March 29th.

3    After thirty days, the next -- the next available date would

4    be April 26.

5            THE COURT:  All right.

6            MR. FARIS:  Thank you, Your Honor.  Excuse me.

7            Mr. Ewert thinks he made a fair bid for the

8    property.  It's much less than the mortgage debt.  As the

9    other counsel have pointed out, it was the only bid that was

10   submitted.

11           There are a couple of other uncertainties that

12   affect the value of the property.

13           THE COURT:  May I -- is it extraordinary to reopen

14   the bidding the way it was done in this case?

15           MR. FARIS:  At the confirmation hearing?

16           THE COURT:  Or does that -- does that --

17           MR. FARIS:  No, it's quite -- it's quite common,

18   Your Honor.

19           THE COURT:  It's a common proceeding?

20           MR. FARIS:  Yeah, even when there are bids at the

21   auction.  If -- typically, if anyone shows up and wants to

22   overbid, that's allowed by the Circuit Court.

23           THE COURT:  Okay.

24           MR. FARIS:  There are some other factors about

25   this property that are mentioned in the commissioner's

1  report.  One is that this property has no access to the
2  street other than by a set of stairs and that creates
3  potential problems with the Americans With Disabilities Act
4  which will have to be rectified at some point at a cost.
5  There's a side of the property on Queen Street that's sort
6  of vaguely worded reservation that can be taken for a
7  widening of Queen Street which is being expanded down
8  through Kakaako.

9          So although the property is currently generating a
10 cash flow which has been mentioned a number of times, there
11 are a number of uncertainties about the future of that cash
12 flow.  And for those reasons, Mr. Ewert thinks his bid was
13 reasonable.

14         Thank you.

15         THE COURT:  Thank you.

16         All right.  We have two hearing dates, one of
17 which is too soon and the other one which is too far out.
18 If either of those dates is acceptable to the parties,
19 that's okay.  Otherwise, I'll have to figure something else
20 out.

21         MR. WEBB:  Your Honor, the bank would prefer March
22 29th.

23         MR. FARIS:  That's acceptable to us.

24         MR. GUBEN:  Not if the Court is going to demand a
25 plan of reorganization, Your Honor.

1    If the Court would like, I'd like to certainly

2  correct the record where Mr. Chapman's misstatement of fact.

3  There were numerous.

4    THE COURT:  We'll have a final hearing on March

5  29th and, Mr. Guben, you will file a proposed plan and

6  disclosure statement not later than March 25th.  I think

7  under the circumstances, that's -- that's enough time in a

8  case like this to -- if you need values and so forth, you'll

9  just have to do your best under the circumstances.

10    So, the -- as far as the motion for relief from

11  stay, the matter will be set for final hearing March 29th,

12  1999, 9:30 a.m.

13    MR. GUBEN:  Could we move for an oral hearing,

14  Your Honor?  I'd like to bring some testimony in on that

15  date.

16    THE COURT:  Yes.

17    MR. GUBEN:  Thank you.

18    THE COURT:  Mr. Webb, you'll do a notice of final

19  hearing please.  The automatic stay will remain in effect

20  pending final hearing.

21    The motion to excuse the compliance with turnover

22  will be granted to and including the date of the hearing on

23  the motion for relief from stay.  The time may well be

24  extended beyond that, but what I'm basically doing is

25  keeping the property in the possession of the receiver which

1   seems to be -- of the custodian, rather, who's doing a good

2   job, and that seems to be a good place to leave the property

3   at the moment.

4           So, I need an order granting the -- the

5   commissioner's motion on the terms that I've stated please.

6           MR. CHAPMAN:  Yes, Your Honor, I'll prepare that

7   order.

8           THE COURT:  Okay.  Is there anything else -- and,

9   oh, that order should be the one that should specify that

10  the Debtor is ordered to file a proposed plan and disclosure

11  statement not later than March 25th.

12          That is extraordinary, Mr. Guben, but under the

13  facts of this case, it seems to be necessary.

14          MR. GUBEN:  Yes, Your Honor.  I can't guarantee a

15  Hawaiian Airlines plan in that two weeks --

16          THE COURT:  Well, you know --

17          MR. GUBEN:  -- but I will come up with the plan.

18          MR. WEBB:  It's not a Hawaiian Airlines case, Your

19  Honor.

20          THE COURT:  Very good rejoinder.  Okay.  Thank you

21  very much.

22          (Whereupon, the hearing was concluded.)

23                          --oOo--

24

25

STATE OF HAWAII          )

                                  )   ss.

CITY AND COUNTY OF HONOLULU  )

        I, JUVELYNN FAGARAGAN, certified court transcriber for the United States Bankruptcy Court for the District of Hawaii, do hereby certify that the foregoing is a true and accurate transcript from the electronic sound recording of the proceedings had in connection with the above entitled cause and was transcribed by me to the best of my ability from the certified tapes furnished to me identified as follows:

        Tape No. 99-35, Log Nos. 0052-1970

        DATED at Honolulu, Hawaii this __9th__ day of __April__, 1999.

                           Juvelynn Fagaragan, Transcriber